Alice **LAWRENCE**, Suzanne Lawrence, Richard Lawrence, and Marta Jo Lawrence, individually, and on behalf of the Estate of Sylvan Lawrence, Plaintiffs,

v.

Seymour **COHN**, Defendant.

No. 90 CIV.2396(CSH).

United States District Court, S.D. New York.

April 29, 2002.

Graubard Miller (Steven Mallis, Esq., C. Daniel Chill, Esq., Elaine M. Reich, Esq., Nancy R. Sills, Esq., of counsel), New York City, for Plaintiffs.

Robinson Silverman Pearce Aronsohn & Berman LLP (Mark Jon Sugarman, Esq., Daniel P. Waxman, Esq., Erin M. Naftali,

Esq., of counsel), New York City, for Defendant.

### MEMORANDUM OPINION
### AND ORDER

HAIGHT, Senior District Judge.

Following full discovery, defendant Seymour Cohn moves pursuant to Rule 56(b), Fed.R.Civ.P., for summary judgment dismissing the plaintiffs' sole remaining claim alleging violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.

Plaintiffs cross-move for partial summary judgment (a) dismissing defendant's first affirmative defense based upon the statute of limitations, (b) dismissing defendant's second affirmative defense alleging that plaintiffs lack standing, and (c) granting cross-relief by finding that plaintiffs are the sellers of a security under § 10(b) of the Securities Exchange Act of 1934 and the regulations promulgated thereunder.

This bitterly litigated case has generated a number of prior opinions, cited in the margin,[1] by this Court and by Magistrate Judge Dolinger. Familiarity with those opinions is assumed. This opinion recites the factual background only to the extent necessary to elucidate the present issues and the Court's bases for decision.

### I.  FACTUAL BACKGROUND

The surviving claim in the case, for securities fraud, arises from the purchase of a 40% interest in a Limited Partnership known as the Ninety–Five Wall Street Company (the "LP"), whose principal asset was an office building located at 95 Wall

Street in Manhattan. The late Sylvan Lawrence and Seymour Cohn were brothers. Prior to the death of Lawrence, Lawrence and Cohn were the LP's only general partners, each owning 30% of the LP's assets. The remaining 40% was owned by the so-called "Aron Group" of limited partners. The Aron Group was comprised of a businessman named Jack Aron and members of his family or business associates.

Paragraph 9 of the Limited Partnership Agreement (the "LPA") provided that upon the death of Lawrence his interest as a general partner in the LP would automatically be converted to a 30% limited partnership in favor of his estate (the "Lawrence Estate" or the "Estate"). Cohn, in his individual capacity, would become the sole general partner with the exclusive right to manage and control the affairs of the LP. Cohn was also named the sole executor of the Lawrence Estate. Lawrence died in December 1981, thereby triggering the provisions of ¶ 9. Cohn qualified under the Lawrence will, and thereafter acted in the dual capacities of general partner of the LP and executor of the Lawrence Estate. Plaintiffs are the beneficiaries of the Estate.

In May 1983, Cohn agreed to purchase the Aron Group limited partners' interests, totalling 40% of the LP assets. That purchase agreement was exclusive of the 30% limited partnership interest Cohn controlled as legal representative of the Estate. According to the transaction documents, Cohn purchased the Aron Group limited partnership interests "as nominee for Seymour Cohn, as Executor of the Estate of Sylvan Lawrence, for Seymour

---

1. Those prior opinions, all bearing the caption *Lawrence v. Cohn* and the docket number 90 Civ. 2396, are reported at 778 F.Supp. 678 (S.D.N.Y.1991); 1992 WL 18801 (S.D.N.Y. Jan. 28, 1992); 816 F.Supp. 191 (S.D.N.Y. 1993); 932 F.Supp. 564 (S.D.N.Y.1996); 2002 WL 109530 (S.D.N.Y. Jan. 25, 2002); and 2002 WL 109532 (S.D.N.Y. Jan. 25, 2002).

Cohn individually, and for any combination thereof."

One may detect in those varied and alternative designations of Cohn's capacity the desirability of obtaining authoritative guidance with respect to the proper allocation of the 40% LP interests Cohn purchased from the Aron Group. For that guidance Cohn looked to the Surrogate. In August 1983, Cohn commenced an "advice and direction proceeding" in the Surrogate's Court (Roth, S.) regarding who, as between Cohn individually and the Estate, should own the 40% Aron Group limited partnership interests Cohn purchased in May 1983. Cohn named plaintiffs as respondents in the advice and direction proceeding.

Surrogate Roth never had to decide the question because in May 1984, Cohn and the plaintiffs entered into a settlement taking the form of a purchase and sale agreement which provided for the final distribution of the 40% limited partnership interests. Pursuant to that agreement, which the Surrogate endorsed, the Estate obtained one-half of the 40% limited partnership interests, and Cohn acquired one-half individually.

These events set the stage for plaintiffs' securities fraud claim. According to plaintiffs, they were misled into agreeing to the settlement distribution because Cohn fraudulently concealed the fact that Chemical Bank was prepared to take a net lease on the entire 95 Wall Street building on extremely favorable terms. Plaintiffs assert that if they had known of the Bank's position, they would have insisted on taking the entire 40% limited partnership interests, rather than sharing that 40% with Cohn.

Plaintiffs' assertion inevitably prompts this question: What would have entitled the Lawrence Estate to insist on taking the entire 40% of Aron Group limited partnership interests, leaving nothing for Cohn as individual sole general partner? Plaintiffs contend that entitlement derives from a right of first refusal in the Estate's favor contained in ¶ 8(b) of the LPA. Defendant contends that ¶ 8(b) did not confer a right of first refusal on the Estate, and that without such a right plaintiffs have no claim, a conclusion plaintiffs do not accept, since their brief asserts an alternative common law theory of recovery. It is clear, however, that the existence *vel non* of a right of first refusal in the Estate's favor is a question of central importance.

A time came when defendant moved to dismiss the complaint under Rule 12(b)(6) for failure to state a claim upon which relief could be granted. I considered that motion in an opinion dated July 12, 1996 and reported at *Lawrence v. Cohn*, 932 F.Supp. 564 (S.D.N.Y.1996) ("the July 1996 Opinion"). The July 1996 Opinion concluded that plaintiffs' complaint stated a viable claim under section 10(b) of the 1934 Securities and Exchange Act and Rule 10–b5, but the Court would abstain from exercising jurisdiction over federal RICO and state law claims. 932 F.Supp. at 581–82.

Extensive discovery then ensued, under the able supervision of Magistrate Judge Dolinger. Defendant now moves for summary judgment in his favor on plaintiffs' surviving securities claim. Plaintiffs resist that motion.

## II. DISCUSSION

### A. *Standard of Review*

Summary judgment may be granted in favor of a defendant only where there are no genuine issues as to any material fact. *Windham v. Time Warner, Inc.*, 275 F.3d 179, 187 (2d Cir.2001). Summary judgment is inappropriate if a review of the record shows sufficient evidence, when viewed in the light of the governing law, to

permit a rational juror to find in plaintiff's favor. *Id.* The court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Golden Pacific Bancorp v. F.D.I.C.*, 273 F.3d 509, 514 (2d Cir.2001).

The case at bar turns upon a question of contractual interpretation. "Summary judgment may be granted when the provisions of a contract convey a definite and precise meaning, absent any ambiguity." *Mellon Bank, N.A. v. United Bank Corp. of New York*, 31 F.3d 113, 115 (2d Cir. 1994) (citation and internal quotation marks omitted). Moreover, Second Circuit case law makes it plain that summary judgment may also be appropriate even where the contract is ambiguous. "The relevant inquiry in deciding a motion for summary judgment is whether 'there is no genuine issue as to any material fact,' Fed. R.Civ.P. 56(c), 'a situation that obtains not only when the language is unambiguous, but also when the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law.'" *Shepley v. New Coleman Holdings Inc.*, 174 F.3d 65, 72 n. 5 (2d Cir.1999) (citing and quoting *Nycal Corp. v. Inoco PLC*, 988 F.Supp. 296, 299 & nn. 9–11 (S.D.N.Y.1997), *aff'd*, 166 F.3d 1201 (2d Cir.1998)).

B. *The Import and Effect of the July 1996 Opinion Denying Cohn's Motion to Dismiss the Complaint*

The briefs of counsel reveal an entertaining threshold dispute with respect to the import and effect of the Court's July 1966 Opinion, which *inter alia* denied defendant's motion to dismiss plaintiffs' securities claim.

Defendant Cohn, now moving for summary judgment after discovery, says of the Court's July 1996 Opinion, on the core issue of the existence *vel non* of a right of first refusal in favor of the Estate, "[T]his Court was unwilling to find that the language [of paragraph 8(b) of the LPA] unambiguously supported Cohn's position such that the Court could rule as a matter of law on this issue on a motion to dismiss," with the result that "this Court must apply the rules of construction applicable to the interpretation of ambiguous contractual provisions." Defendant's Main Brief at 13.

Plaintiffs say that in the July 1996 Opinion "the Court (a) construed the [LPA] as conferring a right of first refusal upon the Estate, (b) determined that such right of first refusal constituted a security, and (c) concluded that the Estate sold that security by relinquishing its right of first refusal in connection with a settlement agreement reached between the parties in a prior proceeding." Plaintiffs' Main Brief at 1–2.

Since the judge who wrote an opinion is uniquely qualified to interpret what he meant by it, I am able to say with some confidence that the defendant's understanding of the July 1996 Opinion is the correct one. Specifically, the intended meaning of the July 1996 Opinion, perhaps incompletely expressed, is that ¶ 8(b) of the LPA was ambiguous with respect to the creation of a right of first refusal in the Estate.

The July 1996 Opinion began by quoting from ¶ 8(b) of the LPA. 932 F.Supp. at 567–68. The question then, and the question now, is whether the language in that paragraph conferred upon the Lawrence Estate (of which plaintiffs are the beneficiaries) a right of first refusal in respect of any interest in the Limited Partnership. Defendant contended then and contends now that it did not. The July 1996 Opinion summarized the contentions of the parties, *id.* at 576–77, observed that

"[c]ontrary to defendant's assertion, the language above does not unmistakably restrict the right of first refusal to transactions initiated by the buyer rather than the seller," *id.* at 577, and completed the discussion of the point by stating: "I am therefore unwilling to conclude as a matter of law that defendant's construction of the right to first refusal is correct." *Id.*

While the July 1996 Opinion did not explicitly characterize ¶ 8(b)'s language as "ambiguous," that adjective is, it seems to me, clearly implicit in the Opinion's analysis; in any event, that is the characterization I sought to convey. Precisely for that reason, defendant's Rule 12(b)(6) motion to dismiss the complaint failed; but it also follows that the post-July 1996 Opinion discovery properly focused upon evidence probative of the signatories' intent with respect to the meaning of ambiguous provisions in the LPA. As noted in Part II.A., *supra*, that ambiguity does not preclude summary judgment in defendant's favor. The remaining question is whether, given the evidence adduced, defendant is entitled to it.

## C. *Plaintiffs' Asserted Right of First Refusal under the LPA*

█ Plaintiffs principally contend that the LPA gave them a right of first refusal with respect to Cohn's purchase of the Aron Group's 40% limited partnership interest. Evaluation of that assertion requires a detailed examination of the language used and the surrounding circumstances.

The LPA had its genesis in negotiations in 1967 between Sylvan Lawrence and Seymour Cohn, on the one hand, and the Aron Group on the other. At that time the Aron Group owned two contiguous parcels of land on Wall Street. Ultimately Lawrence and Cohn purchased that land from the Aron Group, upon which the building known as 95 Wall Street was subsequently constructed.

The LPA was an integral part of the documents drafted by counsel to effectuate the transaction. The law firm of Stroock & Stroock & Lavan ("Stroock") represented the Aron Group. Robert D. Steefel, a Stroock partner now deceased, was the principal draftsman for the Aron Group. He was assisted by a Stroock associate, Richard Siegler, who survives and is a Stroock partner. The attorney representing Lawrence and Cohn was Max Chertoff.

While the negotiations were taking place, Steefel prepared a memorandum to his file dated October 9, 1967. Ex. A to Siegler Affidavit dated March 29, 2001 ("Siegler Aff."). The memorandum considered the form that the transaction documents might take. Paragraph 5 stated:

Part of the Aron interests will receive without cost a 40% participation in the equity, RDS [Steefel] to consider whether the equity should be owned by a limited partnership of which the Arons will be the limited partners and a corporation controlled by Lawrence and Cohen [*sic*] will be the general partner.

Paragraph 11 stated in part:

The limited partnership, or if some entity other than a limited partnership is used, then the controlling agreement, will provide among other things . . .

(b) Before either group can sell its interest, it must give the other side a right of first refusal. One entity shall represent each of the two interests in this connection. There shall be the normal right of transfer between families.

In point of fact, a limited partnership was the vehicle used for the venture, with members of the Aron Group as limited partners holding a total of 40% of the equity and the general partners, Lawrence

and Cohn, each individual holding 30%.[2] The intended function of the LP was to erect 95 Wall Street, an office building, on the two contiguous parcels of land, and to lease office space to third parties.

The attorneys continued their drafting exercises. Eventually the Aron Group, Lawrence, and Cohn signed a "Purchase and Sale Agreement" dated February 29, 1968, Ex. B to Siegler Aff., which recited that they were "entering into a contract for the sale and purchase" of the two Wall Street land parcels. Annexed to the Purchase and Sale Agreement was "a form of limited partnership agreement." The parties to the Purchase and Sale Agreement agreed that "at the closing of title" they would cause the limited and the general partners, as the case may be, to execute the limited partnership agreement and to make the required capital contributions.

Paragraph 8(b) of the proposed form of limited partnership agreement provided in pertinent part:

> In the event that any one or more of the Limited Partners (hereinafter called "Offering Limited Partner") shall receive and wish to accept a bona fide offer for the purchase of his interest in the partnership (hereinafter called the "Outside Offer"), the Limited Partner shall promptly notify the other Limited Partners thereof giving the name and address of the offeror ("Outside Offeror") and a copy of the Outside Offer containing all the terms and provisions thereof, and the other Limited Partners shall be privileged to purchase the interest of the Limited Partner on the same terms as the Outside Offer in the proportion that their respective interests bear to the aggregate interests of all of the Limited Partners other than the interest of the Offering Limited Partner. If some but not all of the Limited Partners choose to purchase the interest of such Limited Partner, those Limited Partners who do choose, may purchase the entire interest of the Offering Limited Partner in the proportion that their interest in the partnership bears to the aggregate interests of all Limited Partners who are purchasing. If the Limited Partners have not agreed to purchase the interest of the Offering Limited Partner within 15 days after the Offering Limited Partner has advised them of the Outside Offer, then the rights of the Limited Partners or any of them to purchase the interest of the Offering Limited Partner shall cease and thereupon at the expiration of such 15 days, the Offering Limited Partner shall advise the General Partner of the Outside Offer, giving to the General Partner the name and address of the Outside Offeror and a copy of the Outside Offer containing all the terms and provisions thereof, and the General Partner shall have the right to purchase the interest of the Offering Limited Partner at the same price and terms as contained in the Outside Offer, provided the General Partner agrees so to do within 15 days after the giving of such notice to it.

Paragraph 8(b) went on to provide that if the other limited partners and the general partners did not exercise their rights of first refusal, the "Offering Limited Partner" was free to accept the "Outside Offer."

The closing was scheduled for June 26, 1968. The day before, on June 25, Steefel, the attorney for the Aron Group, sent to Chertok, the attorney for Lawrence and Cohn, a letter enclosing a revised LPA to

---

2. Contrary to Steefel's expectation as expressed in ¶ 5 of his memorandum to the file dated October 9, 1967, Lawrence and Cohn did not form a corporation controlled by them to act as the general partner.

be signed at the closing. Ex. C to Siegler Aff. The last sub-paragraph in ¶ 9 of the prior draft provided that "[i]n the event of the death of a Limited Partner, the partnership shall not be terminated or dissolved but shall be continued by the other partners." Steefel wrote to Chertok that, following that sub-paragraph, "I have added a provision about continuance of the partnership if one of the general partners dies . . . ." That provision read as follows:

> If either Sylvan Lawrence or Seymour Cohn shall die, retire, or be adjudicated incompetent, the partnership shall not terminate and the other of them shall continue as the sole General Partner. The retired General Partner or the legal representative of the deceased or incompetent General Partner shall be and become a Limited Partner and the share of such retired Partner or of such representatives in the profits, losses including depreciation, and the distributions shall be 30%. The interest of the remaining General Partner shall thereafter be 30%.

At the closing on June 26, 1968, the parties executed the LPA in the form revised by Steefel. Paragraph 8(b), containing the quoted provisions for rights of first refusal, was not changed.

As noted, Sylvan Lawrence died in 1981. In 1983, after Cohn and Jack Aron had discussed the possibility for several years, Cohn and the Aron Group negotiated the sale of the Aron Group's interests in the LP to Cohn. The Stroock firm represented Cohn. Siegler was the Stroock partner primarily responsible for the transaction. The law firm of Weil, Gotshal & Manges ("Weil Gotshal") represented Cohn in his capacity as executor of the Lawrence Estate. Carl Bellows was the Weil Gotshal partner in charge of the matter. The Stroock and Weil Gotshal lawyers had numerous conversations with each other and exchanged numerous letters concerning the negotiations, which came to fruition in a written agreement dated May 23, 1983, Ex. E to Siegler Aff. (the "Aron Sale Agreement"). For a purchase price of $10,000,000, the Aron Group members sold their aggregate 40% limited partnership interests in the LP to "Seymour Cohn, as nominee, for Seymour Cohn, as Executor of the Estate of Sylvan Lawrence, for Seymour Cohn, individually, and for any combination thereof."

Describing his exchanges with Weil Gotshal about this transaction, Siegler states in his affidavit at ¶ 5:

> At no time do I recall that either I or attorneys at Weil, Gotshal took the position that the right of first refusal set forth in Paragraph 8(b) of the Partnership Agreement applied to this transaction. By reason thereof, the Aron Group never offered the Estate the exclusive right to purchase their interests on the terms set forth in the Aron Sale Agreement. If I had believed that the right of first refusal applied to this transaction, I would have addressed this issue explicitly in the Aron Sale Agreement so as to insure that the purchase of the Aron Group interests conformed with the requirements of the Partnership Agreement.

The affidavit of Carl Bellows at Weil Gotshal is to the same effect. Bellows states at ¶ 3:

> I do not recall Jack Aron or any of his representatives, including his attorneys at Stroock & Stroock & Lavan, taking the position that the right of first refusal provision set forth in Paragraph 8(b) of the Articles of Limited Partnership for 95 Wall Street L.P. applied to this transaction. I also do not recall any discussion with Jack Aron or his attorneys about that provision during the sale of the Aron Group's interest, including the negotiation of the agreement memorial-

izing the sale of the Aron Group's interest.

Cohn states in his affidavit ("Cohn Aff.") at ¶ 14:

> At no time during the negotiations for the purchase of the Aron Group Interest did Aron or any of his representatives suggest that the right of first refusal provision contained in Paragraph 8(b) of the Partnership Agreement was applicable to this transaction. Indeed, Aron never even raised the right of first refusal. Neither he nor anyone acting on behalf of the Aron Group ever told me that they were required to offer Sylvan's Estate the exclusive right to purchase the Aron Group's Interest on the terms upon which Aron and I had agreed, and no one made such an offer to the Estate.

The concept of a right of first refusal inuring to the benefit of the Lawrence Estate had occurred to the beneficiaries at about this time. By May 9, 1983, Alice Lawrence, the first-named plaintiff and widow of Sylvan Lawrence, had become so disenchanted with Cohn that she filed on that date in the Surrogate's Court an Order to Show Cause calling upon Cohn as Executor of the Estate *inter alia* "to supply information concerning the assets and affairs of the estate" and to "disclose pertinent information concerning a possible conflict of interest." Reply Affirmation dated June 8, 1983 of Paul Landsman, an attorney for Alice Lawrence, Ex. 24 to Affirmation of Stephen Mallis dated March 11, 2001. Landsman's affirmation stated that "[o]n or about February 9, 1983, Cohn indicated to petitioner [Alice Lawrence] that he was involved in negotiations with the other Limited Partner (the 'Aron interests') for the purchase of their 40% interest in the partnership." ¶ 51. Landsman advanced the contention that "[p]ursuant to the terms of the [LPA], Cohn as General Partner had no right to engage in

such negotiations directly and exclusively," because under ¶ 8(b) of the LPA "any offer to purchase a limited Partnership interest had to be communicated to the other Limited Partner, the estate." *Id.* The Landsman affirmation described Cohn as having "no intent of honoring his fiduciary obligations," ¶ 53, and engaging in "nothing short of a spontaneous demonstration of bad faith," ¶ 55.

As previously noted, compliments such as these prompted Cohn to commence the advice and direction proceeding in the Surrogate's Court in August 1983, naming Alice Lawrence and the other plaintiffs as respondents, and seeking judicial guidance with respect to the proper division of the 40% limited partnership interests that three months previously Cohn had purchased from the Aron Group. Cohn and the plaintiffs settled the matter in May 1984, the Estate and Cohn individually dividing the 40% interests equally, but plaintiffs contend in this action that Cohn procured their consent to the settlement by fraud. Cohn's affidavit on this motion "vehemently den[ies]" any fraud on his part, but contends that the nature of his conduct is irrelevant in any event because "the Estate never had a right of first refusal concerning the sale of all or any portion of the Aron Group Interest." ¶ 19.

And so we circle back to the core question in the case: whether ¶ 8(b) of the LPA conferred upon plaintiffs, as beneficiaries of the Lawrence Estate and *de facto* limited partners of the LP following Lawrence's death, a right of first refusal triggered by the Aron Group's offer in April 1983 to sell the Group's limited partnership interests to Cohn. If that question is answered in the negative, the plaintiffs' claims are in obvious difficulty. "Who steals my purse steals trash," Iago says to Othello, while pursuing his own personal

agenda;[3] but one cannot be the victim of purse-theft if one had no purse to begin with.

In discerning the proper construction of this contractual language, it is useful to explore four questions:

(1) Have the parties by their conduct manifested a practical interpretation of the pertinent terms?

(2) Is there a recognized custom and usage in the drafting of partnership agreements that give meaning to the pertinent terms?

(3) Does case law furnish guidance in the interpretation of the pertinent terms?

(4) Can one of the two competing interpretations be characterized as more rational in the context of the overall contractual scheme? This analysis involves an application of the doctrine of common sense.

I will consider these questions in order.

### 1. *Practical Interpretation*

If plaintiffs' contractual interpretation is correct, it follows that Cohn's offer to purchase the Aron Group's limited partnership interests for $10,000,000 constituted an "Outside Offer," as that phrase is used in ¶ 8(b) of the LPA; and, when the Group decided to accept Cohn's offer, ¶ 8(b)'s provisions transformed the Aron Group into an "Offering Limited Partner" and obligated the Aron Group to "promptly notify the other Limited Partners [*i.e.*, the Lawrence Estate beneficiaries] thereof giving the name and address of the offeror ('Outside Offeror') and a copy of the Outside Offer containing all the terms and provisions thereof, and the other Limited Partners shall be privileged to purchase the interest of the Limited Partner on the same terms as the Outside Offer...." But the practical interpretation manifested by the transaction-related conduct of the Aron Group, Cohn, and their attorneys is contrary to plaintiff's reading of ¶ 8(b).

The Stroock firm advised the Aron Group with respect to Cohn's purchase of the Aron Group's limited partnership interests. Weil Gotshal represented Cohn. The record makes it clear that neither counsel for the Aron Group nor counsel for Cohn thought that ¶ 8(b) of the LPA applied to or had anything to do with the transaction. The Siegler (Stroock) and Bellows (Weil Gotshal) affidavits reveal that the subject never came up. Conceptually, I suppose, one could argue that the two firms simply overlooked the point; and Weil Gotshal, whose client, Cohn, wanted the transaction to go through, might have preferred to forego the role of a messenger announcing an unwelcome complication. But the experienced attorneys at Weil Gotshal were not mere messengers, nor, in this context, only advocates; they were counselors, in the worthwhile tradition of the law, and I may safely assume that they would have alerted Cohn to the complications inherent in ¶ 8(b) if they thought for a moment that ¶ 8(b) applied to the transaction.

This consideration applies with equal if not greater force to the Stroock attorneys. Their obligation was to keep their client of many years, Jack Aron, and the Aron Group out of trouble and free of legal hassle in completing the sale of the Aron Group limited partnership interests to Cohn. I accept Siegler's entirely sensible declaration in his affidavit: "If I had believed that the right of first refusal applied to the transaction, I would have addressed this issue specifically in the Aron Sale Agreement so as to insure that the purchase of the Aron Group interests conformed with the requirements of the Part-

---

**3.** William Shakespeare, *Othello*, act 3, scene 3, line 155.

nership Agreement." The last thing the Aron Group would have wanted was to pocket Cohn's $10,000,000 payment for its limited partnership interests, and then become embroiled in litigation, directly or indirectly, with the Lawrence Estate beneficiaries, the latter brandishing their purported ¶ 8(b) right of first refusal.

The fact that Cohn, Aron, and the able attorneys on both sides of the Cohn/Aron transaction did not believe at the time that ¶ 8(b) of the LPA applied to the transaction, and conducted themselves accordingly, militates in favor of Cohn's present contention that ¶ 8(b) did not apply to the transaction.

### 2. Custom and Usage

Paragraph 8(b) of the LPA makes repeated use of the adjectives "bona fide," modifying the noun "offer," and "outside," modifying the nouns "offer" and "offeror."

In support of his present motion, Cohn submits an affidavit sworn to by Lauris G.L. Rall, Esq. Rall is a partner of the law firm of Thacher, Proffitt & Wood. He has extensive experience in partnership law, with an apparent sub-speciality in limited partnerships, having drafted hundreds of limited partnership agreements and currently serving as a member of the Partnership Committee of the American Bar Association ("ABA") and chairman of the task force and advisor to the ABA section of Business Law on proposed revisions to the Revised Uniform Limited Partnership Act.

Rall examined the LPA. With respect to the term "bona fide offer," Rall's affidavit states at ¶ 4 that the term

has a specific meaning when used in right of first refusal provisions in partnership agreements. It refers to offers made by non-partner outsiders. I have seen that term used in right of first refusal provisions in numerous partnership agreements with which I have been

involved. Invariably, the lawyers drafting those agreements and the parties to those agreements have expressed their understanding that the term "bona fide offer" refers only to offers outside the partnership.

With respect to the term "outside offer," Rall states in ¶ 5 that "I have seen this term or a substantially similar term in right of first refusal provisions in a substantial number of partnership agreements. In my experience, that term has always referred to an offer by an individual from outside the partnership." Rall describes these interpretations as

consistent with the usual purpose underlying right of first refusal provisions of avoiding transfers by partners to unknown and/or uncooperative strangers. To effectuate that purpose, if one partner or group of partners wanted to sell all or part of its interest, the other partner or group of partners would have the right to purchase that interest at the same price as offered by a third party.

*Id.* at ¶ 6.

Rall goes on in ¶ 6 of his affidavit to opine that offers made by existing partners of the limited partnership involved in the case at bar to purchase the interests of other existing partners "would not trigger the right of first refusal under Paragraph 8(b)." That is, of course, the ultimate question in the case; and Rules 702–704, Fed.R.Evid., and Second Circuit caselaw do not allow Rall to express an opinion on it, lest he usurp the function of the factfinder. *See Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Group N.V.,* 14 F.Supp.2d 391, 397–405 (S.D.N.Y.1998) and cases cited. Accordingly I give no consideration to that concluding opinion of Rall's; but he is a qualified expert witness as to the proper interpretation of the terms in question according to the custom and us-

age of drafting limited partnership agreements, and I consider his opinions as probative on those issues.

Plaintiffs took Rall's deposition, and argue from his testimony that "the opinion Mr. Rall expresses in his affidavit regarding the term 'bona fide offer' does not derive from any invariable meaning attributable to that term." Plaintiffs' Brief at 33. Plaintiffs base that assertion upon a partial and highly selective quotation of one of Rall's answers. Their brief at 32–33 includes this passage from Rall's deposition:

Q. Well, let me ask this question: ... does the term "bona fide offer" in the context of the right of first refusal in a partnership agreement as a matter of custom and practice in the industry of drafting such agreements uniformly refer to an offer from a third party based on arm's length bargaining? ...

A. My experience with custom and usage of this term "bona fide offer" teaches me that in a substantial majority of circumstances bona fide offer means not an offer from a partner or an affiliate of a partner ...

While I give plaintiffs' counsel some credit for indicating by an ellipsis that they had not reproduced Rall's complete answer, what they omitted is eyebrow-raising. This is what Rall went on to say, in completion of his partially quoted answer:

It would be wrong to say that uniformly in every partnership agreement out there that the term "bona fide offer" always and necessarily means an offer not by a partner or by an affiliate of a partner if in the context of that partnership agreement, in the language included in that partnership agreement it indicated that offers from partners or affiliates of partners was to be included.

However, I've never seen such a partnership agreement, to the best of my recollection.

Ex. 27 to Mallis Aff. at 99. That omitted testimony is entirely consistent with Rall's affidavit declaration that in his considerable drafting experience, "invariably" the term bona fide offer "refers only to offers by those from outside the partnership." Moreover, plaintiffs' brief also omits this testimony from Rall's deposition:

Q. Does it invariably have that meaning within the context of the custom and practice of the industry that we're talking about, when the words "bona fide offer" appears, does it always have that meaning?

A. I can only speak as to my practice, my experience and I do not recollect any use of "bona fide offer" in this context of a right of first refusal provision that would mean something different than a third-party offer and not an offer from a partner or affiliate of a partner.

Ex. A to Reply Affirmation of Mark Jon Sugarman at 64–65.

In short, I regard Rall's affidavit and deposition testimony as tending to prove that when lawyers drafting limited partnership agreements use the term "bona fide offer" in the context of a right of first refusal, the custom and usage (or practice) of the profession indicates that the term refers only to offers from those outside the partnership, and not to offers by one partner to another. The same meanings attach to the terms "outside offer" and "outside offeror." Given that proof of custom and usage, it is reasonable to infer that the attorneys who drafted the LPA at bar intended the same meanings.

### 3. Case Law

The practical effect of a right of first refusal is to restrain the transfer of the assets or interests in question. The courts

have developed the shorthand phrase "first option restraints." *Globe Slicing Mach. Co. v. Hasner,* 333 F.2d 413, 415 (2d Cir. 1964), *cert. denied,* 379 U.S. 969, 85 S.Ct. 666, 13 L.Ed.2d 562 (1965). In *Hasner* the Second Circuit, applying New York law, noted "the New York policy to construe first option restraints narrowly." *Id.* While *Hasner,* applying that policy, held that the first option provisions in corporate by-laws were not expressed with sufficient clarity to apply to the transfer of shares of stock pursuant to a stockholder's will, its rationale is not limited to that circumstance. In *Lewis v. Rahman,* 147 F.Supp.2d 225, 236 (S.D.N.Y.2001), Judge Cedarbaum, construing a contract between a professional boxer and a promoter, said: "The expiration of the agreement did not trigger CPK's right of first refusal. Rights of first refusal are construed narrowly under New York law" (citing *Hasner*).

New York law governs the case at bar; and New York's policy of narrowly construing first option restraints resonates in this case because plaintiffs' construction of the first refusal provisions in ¶ 8(b) of the LPA so as to apply to the Aron Group/Cohn transaction can only be described as broad, while defendant's differing construction is narrow.

■ Defendant's main brief at 21–26 cites numerous cases from New York and other jurisdictions which, consistent with the policy of narrow construction, hold that where a first refusal provision is silent as to its applicability to transactions between existing stockholders, the restriction is triggered only by sales to outsiders and not to existing stockholders. *See, e.g., Serota v. Serota,* 168 Misc. 27, 30, 5 N.Y.S.2d 68, 71–72 (1938) (where language of the first option restraint "clearly indicates a restriction only as to outsiders or other persons and not parties to the agreement,"

a sale of shares by one party and stockholder to another "was not made to any outsider or 'other person' and consequently there was no violation of the agreement."). Compendia of cases reflect this general rule. *See* G. Van Ingen, Annotation, "Construction and Application of Provisions of Articles, Bylaws, Statutes, or Agreements Restricting Alienation or Transfer of Corporate Stock," 2 A.L.R.2d 745, § 4 (2001) (first option restraints on transfer of corporate stock—"having mainly for their purpose the prevention or discouragement of sales to outsiders—usually have been construed not to apply when one stockholder attempts to sell his stock to another stockholder without first offering the remaining stockholders an opportunity to purchase proportionately or otherwise, unless the agreement so provides or is necessarily subject to such an implication.").

This line of authority applies to the case at bar because at the time of the Aron Group/Cohn transaction, the members of the Aron Group, plaintiffs, and Cohn were indisputably all partners in the 95 Wall Street Limited Partnership. The Aron Group members owned their respective limited partnership shares. Cohn owned the 30% general partner's interest that he had held since the inception of the LP. Plaintiffs, as heirs of Sylvan Lawrence, had by virtue of the language added to ¶ 9 of the LPA just before the closing become the beneficial owners of an aggregate 30% limited partnership interest—the interest that, prior to his death, had been Lawrence's 30% general partner's interest.

Plaintiffs' brief attempts unsuccessfully to distinguish these cases on their facts, and cites no cases which question a policy of narrow construction of first option restraints or argue for a different policy.

It is clear that case law favors the interpretation of ¶ 8(b) of the LPA contended for by defendant Cohn.

### 4. *Common Sense*

I begin this analysis by focusing upon what the initial partners had in mind, as manifested by the Articles of Limited Partnership of Ninety–Five Wall Street Company (to give the LP's founding document its full title; I will continue to refer to the document as the LPA).

It is a striking reflection upon the close affiliation of Sylvan Lawrence and Seymour Cohn, brothers and business partners, that the preamble to the LPA, after naming them both and stating their separate residence addresses, referred to them in the singular as the "General Partner." Lawrence and Cohn's many real estate investments were always in equal proportion to each other, and they seldom had other partners, principally because they "wanted full decision-making control with respect to the investments without interference from others." Cohn Aff. at ¶ 2.

By way of contrast, the preamble to the LPA referred to the members of the Aron Group in the plural, as the "Limited Partners." Lawrence and Cohn were prepared to take the Aron Group in as partners in the 95 Wall Street LP because they had known Jack Aron for many years, "we knew and trusted Aron, and because Aron made it clear to us that he would control his group and make all decisions on the group's behalf." Cohn Aff. at ¶¶ 6, 7.

The respective interests of the LP partners may be divined by examining ¶ 3 of the LPA, captioned "Capital," and ¶ 4, captioned "Profit and Loss, Distribution of Funds." Paragraph 3 provided that the LP's initial capitalization was $404,920, made up of these contributions: General Partner (Lawrence and Cohn), $104,920, and as Limited Partners, Jack R. Aron, $82,500; Marvin R. Schur, $30,000; Edward R. Roberts, $7,500; Schur and Bernard E. Brandes, as trustees under a trust created by Jack R. Aron for the benefit of Robert Aron, $90,000; and Schur and Brandes, as trustees under a trust created by Jack R. Aron for the benefit of Peter Arthur Aron, $90,000. Paragraph 4 provided for the distribution of LP profits and losses as follows: General Partner, 60%, and Limited Partners Jack R. Aron, 11%; Marvin H. Schur, 4%; Edward R. Roberts, 1%; Schur and Brandes as trustees of the trust for Robert Aron, 12%; and Schur and Brandes as trustees of the trust for Peter Arthur Aron, 12%; for an aggregate Aron Group total interest of 40%.

Several points of view may be discerned from these arrangements. Lawrence and Cohn were content to enter into partnership with the Aron Group because they retained full control of the operation as sole "general partner,"[4] they would receive 60% of the profits (divided equally between them, as was the brothers' practice), and they knew and trusted Jack Aron and relied upon his undertaking to control the other limited partners in the Aron Group. Jack Aron was content to enter into partnership with Lawrence and Cohn because the family-oriented group of which he was the patriarch was assured of 40% of the profits and had no management responsibilities.

I now return to ¶ 8(b) of the LPA, quoted in pertinent part *supra*. That language first appeared in the form LPA attached to the February 29, 1968 purchase and sale agreement between the Aron Group, Cohn,

---

4.  Paragraph 5 of the LP provided that "[d]uring the continuance of the partnership, the General Partner shall have full power of management and control of the conduct of the business."

and Lawrence. It is useful to reflect that at that time, the Aron Group members were the only limited partners contemplated by the LPA. Within that context, the application of common sense reveals clearly enough the intended purposes of ¶ 8(b)'s rights of first refusal.

The limited partners' right of first refusal guaranteed that if, notwithstanding Jack Aron's asserted patriarchal control over members of the Aron Group, one of them desired to leave the reservation and expressed a wish to accept an "Outside Offer" for his limited partnership interest, the other limited partners had the right to match the offer and thus block the sale to an "Outside Offeror." [5] Thus the limited partners' right of first refusal assured Jack Aron and the remaining loyalist members of the Aron Group that the Group's aggregate 40% limited partnership interests would never be diluted by a sale to an "outsider."

The general partners' [6] right of first refusal guaranteed that if the limited partners, by choosing not to exercise their own right of first refusal, opened the door to a purchase by an "outsider," the general partners could slam that door in the outsider's face by matching his offer. Thus the general partners' right of first refusal assured Lawrence and Cohn that they would never find themselves in the company of strangers, upon whose kindness they had made it a lifelong policy not to depend.

At this point in the etymology of ¶ 8(b), one searches in vain for an indication that the adjective "outside," modifying the nouns "offer" and "offeror," were intended to or did have anything other than their usual dictionary meaning, *viz.,* "not belong-

ing to or originating in a certain group or association," *The American Heritage Dictionary of the English Language* (4th ed.2000). It is not sensible to apply the adjective "outside" to original existing partners, general or limited, present at the creation of the LPA and "insiders" by any sensible definition. Consequently common sense indicates that if one Aron Group limited partner, say Marvin H. Schur, wished to sell his 4% interest to another Aron Group limited partner, say Jack Aron with 11%, the limited partners' ¶ 8(b) right of refusal would not be triggered.

But we have also seen that on June 25, 1968, the day before the closing on the purchase and sale agreement and its accompanying LPA, Steefel, the Stroock partner representing Aron, sent to counsel for Lawrence and Cohn a proposed addition to ¶ 9 of the LPA which contemplated a manner in which additional limited partners might come into being. That addition, which I have also quoted *supra,* provided in pertinent part that if either Lawrence or Cohn died, his "legal representative . . . shall be and become a Limited Partner" with a 30% interest. The LPA as executed by the parties contained that language as well as the previously drafted ¶ 8(b).

The quoted language from ¶ 9 having been added to the LPA, I will revisit the effect of a common-sense reading of the several rights of first refusal contained in ¶ 8(b). In performing that analysis, I assume without deciding that the beneficiaries of the estate of a deceased general partner are "limited partners" within the

---

5. The careful reader will recall that the phrases "Outside Offer" and "Outside Offeror" are taken from the language of ¶ 8(b) of the LPA.

6. I will refer to Lawrence and Cohn in the plural as "the general partners," notwithstanding their self-declared, joined-at-the-hip designation as "the general partner" in the preamble to the LPA.

meaning of ¶ 8(b).[7]

As for the Aron Group limited partners, they could exercise their ¶ 8(b) right of first refusal to block a sale to an "outsider" by a limited partner Estate beneficiary, just as they could exercise their ¶ 8(b) right of first refusal to block a sale to an "outsider" by a limited partner member of the Group. That exercise would not be necessary to avoid dilution of the Aron Group's aggregate 40% limited partnership interest; rather, it would increase that interest beyond 40%. But it preserves the character of the partnership as a long-standing commercial alliance of two families. In that regard, it is noteworthy that the addition to ¶ 9 was suggested by Steefel, Aron's lawyer, for the stated purpose of continuing the partnership in the event of the death of Lawrence or Cohn.

As for the surviving general partner, the right of first refusal conferred upon him by ¶ 8(b) ensured that no limited partner, Aron Group or Estate beneficiary, could inflict upon the partnership an unwelcome stranger. That had always been an objective of the two brothers, Lawrence and Cohn, when both were alive, and there is no reason to suppose that a surviving brother would feel any differently.

As for the Estate beneficiary limited partners, their right of first refusal with respect to an "outside" offer made by an "outside" offeror preserves them from the spectre of a disaffected family member selling his or her limited interest to a potentially quarrelsome and uncooperative stranger. That is a benefit that surely commended itself to Lawrence and Cohn when they executed the LPA in 1968, for it is consistent with the two brothers' long-standing policy.

Reading ¶ 8(b) from the original draft LPA in conjunction with the eve-of-closing addition to ¶ 9, I remain unable to discern an intention to extend to a limited partner, either an original one (the members of the Aron Group) or a limited partner subsequently created by the death of a general partner (the beneficiaries of the Lawrence Estate), a right of first refusal with respect to an offer by one existing partner to purchase the partnership interest of another. Nor does this seem a sensible interpretation of ¶ 8(b). If, as seems to me clear, an original limited partner had no right of first refusal in respect of such a purchase, it is irrational to extend the right to limited partners created by after-occurring events. For those who find guidance in Latin maxims, *a fortiori* comes to mind.

To resume the narrative: After execution of the LP in 1968, the 95 Wall Street office building was constructed. So far as the record reveals, Lawrence and Cohn as general partners and the Aron Group as limited partners dwelt together in amicable and profitable harmony. But a time came when Jack Aron and Cohn had discussions about the Aron Group selling

---

**7.** The parties dispute that issue. Defendant argues that "[t]here is nothing in the Partnership Agreement to suggest that the parties intended the legal representative of a deceased or incompetent General Partner to have any of the rights afforded to the original Limited Partners except for the right to receive distributions and allocations that formerly would have been made to the deceased general partner." Main Brief at 31. From that proposition defendant reasons that even if the right of first refusal applied to purchase offers made by existing partners (which defendant denies), that right does not extend to plaintiffs, the beneficiaries of the Lawrence Estate. Plaintiffs respond that the last paragraph of ¶ 9 of the LPA "could not be clearer that the Estate became a limited partner upon Sylvan's death and was therefore entitled to all rights attendant to such status within contemplation of the agreement," including the ¶ 8(b) right of first refusal. Brief at 38. In the view I take of the case, I need not decide this question.

their limited partnership interests, albeit not to "outside" interests as that word is used in ¶ 8(b) of the LPA. Lawrence had fallen ill. Cohn says in his affidavit at ¶ 12: "Aron and I first had discussions about the possibility of his selling the Aron Group's interest in the 95 Wall Street Partnership when I met him at Mt. Sinai Hospital while I was visiting Sylvan and Aron was visiting his wife." As noted, Lawrence died in December 1981. The beneficiaries of the Lawrence Estate became (on the assumption I am indulging in their favor for this discussion) limited partners of the LP, entitled to an aggregate 30% interest. Cohn and Aron continued their discussions and, as noted, in 1983 the Aron Group sold their aggregate 40% limited partnership interests to Cohn, in the manner previously described.

Plaintiffs contend that ¶ 8(b) gave them a right of first refusal with respect to this sale by limited partners to the surviving general partner. However, I conclude that, in addition to the factors discussed under Parts II.C.1–3, *supra*, common sense and the plain meaning of the adjective "outside" defeat plaintiffs' contention. Defendant stressed the ordinary meaning of "outside" on his motion to dismiss the complaint under Rule 12(b)(6) and did not quite carry the day, but viewing the word in the context of the entire circumstances as revealed by discovery, I am persuaded that plaintiffs had no right of refusal to exercise with respect to the Cohn/Aron sale between existing ("inside," one may fairly say) partners.

That conclusion is strengthened by the ease with which the LPA could have been drafted so as to create rights of first refusal with respect to partners' sales of interests *inter se.* But the LPA does not say that, and I decline to read the document as if it did. In giving this first option restraint that narrow reading the law re-

quires, "[t]he Court must construe the agreement as it is, and not as the plaintiffs would like it to be." *Serota*, 168 Misc. at 30, 5 N.Y.S.2d at 71.

For the foregoing reasons, I conclude that the LPA did not confer upon plaintiffs a right of first refusal with respect to Cohn's purchase of the Aron Group limited partnership interests.

■ It follows that, to the extent plaintiffs' securities fraud claim depends upon a right of first refusal in the LPA, the claim fails because plaintiffs cannot demonstrate the essential element of loss causation.

■ "It is settled that causation under federal securities laws is two-pronged: a plaintiff must allege [and prove] both transaction causation, *i.e.,* that *but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.,* that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity Investors v. Toronto–Dominion Bank,* 250 F.3d 87, 95 (2d Cir.2001). The theory of plaintiffs' claim against Cohn is that Cohn's fraudulent statements and omissions on the subject of 95 Wall Street's economic circumstances induced them to agree to settle the advice and protection proceeding before Surrogate Roth, thereby foregoing their entitlement to purchase all the Aron Group's interests conferred upon them by the LPA's right of first refusal. Assuming without deciding that the record demonstrates fraudulent conduct on the part of Cohn, plaintiffs may have shown transaction causation. But the LPA did not give plaintiffs a right of first refusal. Plaintiffs cannot lose what they never had. Insofar as plaintiffs' securities fraud claim against Cohn rests upon a non-existent right of first refusal in the LPA, plaintiffs cannot show loss causation.

D. *Plaintiffs' Asserted Right of First Refusal under the Common Law*

▮ Plaintiffs assert an alternative source of a right of first refusal. They contend that they possessed "a common law right of first refusal." Brief at 39. Characterizing Cohn, in his capacity as executor of the Lawrence estate, as their fiduciary, plaintiffs invoke the familiar principle that "a fiduciary may not compete with his *cestui que trust*," *id.*, so that Cohn, "as a fiduciary, could not properly have purchased [the Aron Group] interests for himself." *Id.* at 40. Rather, plaintiffs' argument concludes, Cohn should have offered the entire 40% Aron Group interest to the Estate for purchase. Plaintiffs place principal reliance upon *Renz v. Beeman*, 589 F.2d 735 (2d Cir.1978), *cert. denied*, 444 U.S. 834, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979).

This contention gives rise to a threshold jurisdictional question. If plaintiffs' common law theory of fiduciary duty does not implicate the federal securities laws, then in the absence of diversity of citizenship this Court's subject matter jurisdiction would depend solely upon supplemental jurisdiction under 28 U.S.C. § 1367. But plaintiffs' federal claims based upon the LPA will be dismissed for the reasons stated; and it is generally held that when a district court dismisses the underlying federal claim, supplemental state or common law claims should be dismissed as well. That rule is frequently applied to dismissals under Rule 12(b)(6), *see, e.g., Castellano v. Bd. of Trs. of Police Officers' Variable Supplements Fund*, 937 F.2d 752, 758 (2d Cir.1991) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.") (citation omitted), but applies with equal vigor to Rule 56 summary judgment dismissals of federal claims, *see Lennon v. Miller*, 66 F.3d 416, 426 (2d Cir. 1995) (court of appeals affirmed district court's summary judgment dismissal of federal claim and then dismissed supplemental claims *sua sponte*). Defendant at bar does not make this point, but that is of no matter; the question being jurisdictional, the Court is obligated to consider it on its own initiative.

Having done so, I conclude that plaintiffs' common law theory of a right of first refusal does not deprive their fraud claim of its federal securities character. For the reasons stated at some length in this Court's July 1996 Opinion, 932 F.Supp. 564, a right of first refusal would give plaintiffs standing to assert a viable federal securities fraud claim against Cohn, and I do not think the particular source of that right makes any difference to the analysis. But it is appropriate to raise the question, in the event that the case eventually comes to the attention of the court of appeals.

So the questions on summary judgment on this aspect of the case, following full discovery, are these: (1) Did a common law fiduciary duty obligate Cohn to give plaintiffs an opportunity to purchase the Aron Group interests? (2) If such duty existed, did it entitle plaintiffs to purchase the entire 40% Aron Group interest, or only part of it? (3) Given the terms of the Surrogate Court proceeding settlement, can plaintiffs show that element of loss causation requisite to a federal securities claim? To those questions I now turn.

The duty the common law imposes upon a fiduciary such as a trustee or an executor is easy enough to state in general terms. Chief Judge Cardozo (as he then was) phrased the proposition elegantly in *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (1928): "A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the

punctilio of an honor the most sensitive, is then the standard of behavior."

However, the application of that principle to a particular case is frequently more complex. Courts must consider the totality of the circumstances. These include the nature of the transaction involved, the personal interests of the fiduciary and the beneficiaries in that transaction, and the consequences of the conduct alleged to have breached the fiduciary duty.

Such complexities are illustrated by *Meinhard v. Salmon* itself. Meinhard and Salmon were "coadventurers, subject to fiduciary duties akin to those of partners." 249 N.Y. at 462, 164 N.E. 545. The adventure in question was a twenty-year lease of a former Manhattan hotel building to be renovated for use as shops and offices. Meinhard paid Salmon half the amount necessary to reconstruct and operate the property. After the first five years of the lease, Meinhard and Salmon divided any profits and losses equally. "Salmon, however, was to have sole power to 'manage, lease, underlet and operate' the building." *Id.* After some lean years, the coadventurers prospered. When the lease had less than four months to run, Salmon agreed with the property owner on a lucrative new lease between the owner and a corporation owned by Salmon. Salmon said nothing about the new lease to Meinhard, who learned about it only after the new lease was an accomplished fact. Meinhard sued Salmon and the property owner, demanding that the new lease "be held in trust as an asset of the venture" initially entered into between Meinhard and Salmon.

The New York Court of Appeals held by a 4–3 vote that Salmon had breached the duty .as a "managing coadventurer" he owed to Meinhard, the breach lying in Salmon's "appropriating the benefit" of the new Lease "without warning to his partner" Meinhard. 249 N.Y. at 468, 164 N.E. 545.[8] The remedy fashioned by the majority opinion is instructive. The trust declared by the lower court was held "to attach to the [new] lease which was in the name of the defendant corporation [owned by Salmon]." *Id.* at 469, 164 N.E. 545. The Court of Appeals said that the trust "ought to attach at the option of the defendant Salmon to the shares of stock which were owned by him or were under his control," and went on to reject an equal division of the shares between Salmon and Meinhard, which, the Court reasoned,

> might take away from Salmon the power and control and management *which under the plan of the joint venture he was to have from first to last.* The number of shares to be allotted to the plaintiff [Meinhard] should, therefore, be reduced to such an extent as may be necessary to preserve to the defendant Salmon the expected measure of dominion. To that end an extra share should be added to his half.

*Id.* (emphasis added).

The "central question" presented in *Renz v. Beeman,* the Second Circuit case upon which plaintiffs at bar rely, was "the obligation, under New York law, of a trustee of a family trust which controls a family corporation through ownership of a majority of the voting stock, where more than a

---

**8.** Chief Judge Cardozo wrote the majority opinion in which three judges concurred. Judge Andrews' dissent, joined in by two judges, concluded that Salmon owed Meinhard no duty to tell him about the new lease because "[t]here was no general partnership, merely a joint venture for a limited object, to end at a fixed time." 249 N.Y. at 473, 164 N.E. 545. The closely divided Court and the prominence of the differing opinions' authors illustrate the complexities inherent in applying general principles of fiduciary duty to particular transactions.

single branch has a beneficial interest." 589 F.2d at 745. Finch, Pruyn and Company, Inc., a successful New York paper products manufacturer ("Finch–Pruyn"), was originally formed in 1865 as a partnership between the late Samuel Pruyn and the late Jeremiah Finch. It was incorporated in 1904. The corporation issued shares of preferred stock and common stock. Only the preferred stock carried voting rights. Initially both classes of stock were divided equally between Samuel Pruyn and the Jeremiah W. Finch family, although subsequently "by means of purchases from the Finch family, Samuel Pruyn increased his holdings in Finch–Pruyn to a two-thirds interest." *Id.* at 740.

As the years went by and one generation succeeded another upon the stage of life, the Finch–Pruyn voting shares originally held by Samuel Pruyn passed into the possession of his heirs and descendants by means of a series of wills, testamentary trusts, and *inter vivos* trusts. In order to frame the question presented by the case, the Second Circuit felt it necessary to engage, in Judge Gurfein's apt phrase, "in a tedious recital of the genealogy of the Pruyn family, united by blood, but estranged in later generations by competing ambitions." 589 F.2d at 740. I think that I can in good conscience avoid some of the tedium and fast forward (in the modern vernacular) to the transaction that triggered the litigation.

In 1954 members of branches of the Pruyn family, descended from Samuel Pruyn's two grandchildren, Mary Van Ness Hyde and Samuel Pruyn Hoopes, made an agreement which created three *inter vivos* trusts in a single instrument called the 1954 Trust. The 1954 Trust held a majority of the voting shares of Finch–Pruyn. Beneficial ownership was divided equally between members of the

Hyde and Hoopes families. The settlors of the 1954 Trust named Lyman A. Beeman and Mary Hoopes Beeman to be the trustees. Lyman and Mary Beeman were husband and wife. As Mrs. Beeman's middle name indicates, she was a member of the Hoopes branch of the Pruyn family.

In 1958 the Metropolitan Museum of Art, of all unlikely entities, acquired 2,000 shares of voting preferred and 6,300 shares of non-voting common stock of Finch–Pruyn as the result of a bequest in the will of the late Helen Finch Foulds, one of the heirs of the Finch side of the business. The officers of Finch–Pruyn wished to purchase these shares, and the Museum, although presumably suitably grateful to the late Mrs. Foulds, was quite prepared to part with them. Eventually Finch–Pruyn purchased the non-voting common stock at $140 per share and Mary Beeman purchased the voting preferred at $120 per share. However, "[t]he shares acquired by Mrs. Beeman in these circumstances were not put into the 1954 Trust but were held by her outright." 589 F.2d at 742. Learning of this, Trust beneficiaries from the other branch of the Pruyn family sued the Beemans for breach of their fiduciary duties as trustees.

The Second Circuit, reversing the district court, held that the trustees had indeed breached their fiduciary duties. Because *Renz v. Beeman* furnishes a further illustration of how the particular circumstances of a case govern the application of the general principle, it is useful to quote Judge Gurfein's opinion at some length:

As far as this appeal is concerned, we deal with only a single large purchase which could, as indeed it did, give unchallengeable control of Finch–Pruyn to the Hoopes branch for generations to come. The absolute control of the Finch–Pruyn corporation was an asset of the trust. It is to the preservation of

the joint control created by the settlors that the trustee had a fiduciary obligation. By putting the shares for control into a single basket, the settlors pledged the trustee not to disarrange the balance of control that had been created.... When the trust is settled by two branches of a family, who jointly own control of a family company, the chancellor will insist that a trustee with ties to one branch should not disfavor the other. To upset the balance of control for selfish gain is to commit a breach of the high fiduciary duty of undivided loyalty.... By purchase of the 2000 Foulds shares, Lyman and Mary Beeman succeeded in taking for themselves and their family absolute control of the voting stock forever.... When the Foulds stock became available, it was the duty of Beeman, as trustee, to notify the life-tenants, who because of their powers of appointment could have given binding consent to the purchase; and to offer the stock to the Finch–Pruyn Company as a means of preserving the balance of control between the Hyde and Hoopes families.... At the least, the trustees should have petitioned for court approval for Mrs. Beeman to make the purchase.

589 F.2d at 746–748 (citations omitted). Judge Moore dissented, stating that "I differ with Judge Gurfein's opinion as to the fiduciary-trustee issue on his application of the law to the facts or possibly better the facts to the law." 589 F.2d at 752. Judge Moore would have affirmed

the district court's holding dismissing the complaint. The majority in *Renz v. Beeman* did not undertake to fashion a remedy, instead remanding the case to the district court for further proceedings.[9]

The briefs of counsel also discuss *Wootten v. Wootten*, 151 F.2d 147 (10th Cir. 1945), which involved a corporate entity called Red River Ranch, Inc. Prior to incorporation two brothers, R.K. Wootten and John B. Wootten, owned undivided one-half shares in the ranch properties. R.K. Wootten died. John B. Wootten formed the corporation and transferred all the ranch properties to it. In doing so, John B. Wootten acted for himself individually; as executor of the estate of R.K. Wootten, of which R.K. Wootten's widow was a beneficiary; and as trustee of a testamentary trust established by the will of R.K. Wootten for the benefit of his four children. John B. Wootten individually on the one hand, and the R.K. Wootten estate and trust on the other, held equal numbers of shares of the corporate stock. A third group of shares was held in the corporate treasury for the purpose of eventually satisfying an undertaking given to one W.R. Ferguson, the ranch manager.

After litigation whose details I need not recount, Ferguson became the owner of 536 shares of corporate stock. John B. Wootten purchased those shares from Ferguson for himself, thereby securing a majority interest in the stock of the corporation, which gave him control. R.K. Wootten's widow and the four R.K. Woot-

**9.** As a footnote to history, it may be observed that following remand of *Renz v. Beeman* from the Second Circuit to the Northern District of New York, that litigation "was resolved by a 1981 settlement agreement in which the number of trustees of all three trusts was expanded to five, consisting at the time of three trustees from the family branches of the original owners and two trustees from management." *Hoopes v. Carota*, 142 A.D.2d 906, 907, 531 N.Y.S.2d 407, 408 (1988). Members of the family branches have gone on battling in the state courts, at least as recently as 1989, *see* 74 N.Y.2d 716, 544 N.Y.S.2d 808, 543 N.E.2d 73 (1989), but if any economic remedy was fashioned by settlement or decree with respect to Mary Beeman's personal purchase of the 2,000 Foulds shares, the reported cases do not reveal it.

ten children, alleging that John B. Wootten's individual purchase of the Ferguson shares breached his fiduciary duties as executor and trustee, sued John B. Wootten to impress a trust upon the purchased shares proportionate to their interests.

The district court dismissed the complaint for failure to state a claim. A divided panel of the Tenth Circuit reversed. The majority said:

It is our opinion that under the facts well pleaded and the facts reasonably to be inferred therefrom, John B. Wootten, in acquiring all of the 536 shares of the Ferguson stock solely for himself individually, failed to measure up to those high standards of conduct which courts of equity have laid down as a measure of behavior required of a fiduciary and that the motions to dismiss should have been overruled.

It may be on a hearing, John B. Wootten can satisfy the chancellor that, in failing to purchase *half of such stock* for the estate and for the trusts, he acted in good faith and in the exercise of a wise discretion. That issue, however, we think should be resolved after a full and searching inquiry into the facts.

151 F.2d at 150 (emphasis added) (footnote omitted). The dissenting judge thought that the complaint failed adequately to allege a breach by John B. Wootten of a fiduciary duty either as executor, *id.* at 151, or as trustee, *id.* at 152–53.

What guidance do these cases furnish in determining the existence and the extent of any fiduciary duty Cohn as executor of the Lawrence Estate owed to plaintiffs with respect to Cohn's purchase of the Aron Group interests in the LP?

One proposition clearly emerges. Notwithstanding the exaggerated claims in the briefs of plaintiffs and defendant at bar, in this area of the law the precedential value of particular cases is minimal. " 'Little

profit will come from a dissection of the precedents.' Decision in each case must rest on its facts." *Renz v. Beeman*, 589 F.2d at 752 (Moore, C.J., dissenting and quoting Chief Judge Cardozo's opinion in *Meinhard v. Salmon*, 249 N.Y. at 466, 164 N.E. 545). Indeed, the difficulties inherent in applying general concepts of fiduciary duties to particular circumstances are underscored by the fact that the *Meinhard, Renz* and *Wootten* cases were all decided by divided appellate courts.

But this much is also clear. None of the cited cases supports plaintiffs' contention that Cohn's fiduciary duty as the Estate executor obligated him to offer the entire 40% Aron Group interest to plaintiffs, the beneficial owners of an aggregate 30% limited partnership interest. Plaintiffs' grasping for the entire Aron Group interest entirely overlooks Cohn's individual 30% interest as the surviving general partner. Far from supporting plaintiffs' claim for the entire Aron Group interest, cases like *Meinhard v. Salmon* and *Wootten v. Wootten* reinforce Cohn's contention that his individual ownership position and control status as general partner must be taken into account in any equitable division.

Thus the division of corporate shares in *Meinhard* allocated to Salmon, despite his breach of fiduciary duty, was one half of the shares *plus one share*, in order to reflect the corporate control responsibilities Salmon bore under the original joint venture agreement with Meinhard. The 95 Wall Street LPA is closely analogous: ¶ 5 provides that "the General Partner [Cohn] shall have full power of management and control of the conduct of the business." Paragraph 6 provides that "the Limited Partners shall have no voice in or right to manage or control the partnership affairs and business and shall be deemed to have only those rights concerning the

conduct of partnership affairs as are provided for limited partners pursuant to the Partnership Law of the State of New York." As for *Wootten,* the Tenth Circuit's majority opinion remanding the case to the district court for trial strongly suggests that the extent of James B. Wootten's breach of fiduciary duty lay in his failure "to purchase *half* of [the Ferguson stock] for the estate and for the trusts," 151 F.2d at 150 (emphasis added), a considered phrase reflecting Wootten's individual ownership of half of the other shares.

Plaintiffs' contention, if sound, would leave Cohn with a 30% interest and plaintiffs, the Lawrence Estate beneficiaries, with 70%: their 30% limited partnership interest occasioned by Lawrence's death, swollen by the entirety of the Aron Group 40% interest. Such a division would fundamentally skew the equal division of interests which the two Founding Brothers, Sylvan Lawrence and Seymour Cohn, always maintained. I think that would be an inequitable division. Nothing in the cited cases supports or requires it. On the contrary, to the extent that the cases are instructive, they point the other way.

I regard the existence *vel non* of any common law fiduciary duty falling upon Cohn in the circumstances of this case as a close question. But I will assume without deciding that the availability of the Aron Group limited partnership interests for purchase triggered a fiduciary duty Cohn owed as executor of the Lawrence Estate to plaintiffs. However, I conclude that the maximum allocation to which equity would entitle plaintiffs is precisely that allocation achieved by the settlement of the advice and direction proceeding before the Surrogate: an equal division of the Aron Group 40% interest between Cohn individually and the plaintiffs, so that, at the end of the day, the interests of Cohn and the Lawrence heirs in the partnership each total 50%—a reprise of the Founding Brothers' own tradition. We will never know if that is the disposition Surrogate Roth would have decreed if the advice and direction proceeding had not been settled; nor would I presume to speculate upon the possible or likely decision of so able and experienced a judge. But this allocation seems to me, in light of the cases, to be the most favorable that plaintiffs could have hoped for at the hands of a chancellor in equity, assuming that Cohn owed plaintiffs any fiduciary duty at all.

It follows that plaintiffs, having surrendered no enforceable right in agreeing to the settlement, fare no better in showing loss causation on their common law theory of securities fraud than they did when relying upon a non-existent right of first refusal under the LPA.

For these reasons, defendant is entitled to summary judgment dismissing the complaint.

## III. CONCLUSION

Plaintiffs make a number of arguments. I have considered them all. They do not alter the Court's conclusion with respect to the failure of plaintiffs' federal securities fraud claim. The briefs of counsel raise other issues which I need not reach or need not discuss in detail.[10] Defendant's motion for summary judgment will be granted.

The Clerk of the Court is directed to enter summary judgment in favor of de-

---

10. For example, defendant argues in the alternative that "if the Estate had no right of first refusal, then plaintiffs have no standing to bring a claim under Section 10(b) of the 1934 Act or Rule 10b–5 because they were not 'purchasers' or 'sellers' of securities." Main Brief at 42. In the view I take of the case, as explained in text, I need not reach this issue.

fendant and against plaintiffs, dismissing the complaint with prejudice.

Plaintiffs' cross-motion is denied as moot, given the disposition of defendant's motion.

It is SO ORDERED.