Alice LAWRENCE, individually, and on behalf of the Estate of Sylvan Lawrence, including the Residuary Trust; Suzanne Lawrence, individually, and on behalf of the Estate of Sylvan Lawrence, including the Residuary Trust; Richard Lawrence; Marta Jo Lawrence, individually, and on behalf of the Estate of Sylvan Lawrence, including the Residuary Trust, Plaintiffs–Appellants,

v.

Seymour COHN, Defendant–Appellee.

Docket No. 02–7642.

United States Court of Appeals, Second Circuit.

Argued Dec. 5, 2002.

Decided: March 28, 2003.

Steven Mallis, Graubard Miller (C. Daniel Chill, Elaine M. Reich, and Nancy R. Sills, on the brief), New York, NY, for Plaintiffs–Appellants.

Daniel P. Waxman, Bryan Cave LLP (Mark Jon Sugarman and Erin M. Naftali, on the brief), New York, NY, for Defendant–Appellee.

Before: WALKER, Chief Judge, OAKES and CARDAMONE, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge.

In this case, denominated a securities fraud action, plaintiffs-appellants Alice Lawrence, Suzanne Lawrence, Richard Lawrence, and Marta Jo Lawrence, individually and on behalf of the Estate of Sylvan Lawrence (collectively, the "plaintiffs" or the "Estate"), ask this court to plumb the vagaries of New York law concerning estates and fiduciary relationships, an area ordinarily within the sole purview of state courts, to determine the nature and extent of plaintiffs' legal entitlement to purchase additional shares in a partnership. Plaintiffs contend that inasmuch as they were legally entitled to purchase all of the available shares under both New York's common law and the partnership agreement, their release of this right in a settlement agreement in alleged reliance on misrepresentations concerning the financial prospects of the partnership satisfied the requirements of securities fraud under Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), (the "Exchange Act").

We conclude that because the common law rights asserted by plaintiffs are not contractual and, in any event, are conjectural and uncertain in scope, they do not fall within the Exchange Act's definition of "security" as required to bring a claim for damages based on securities fraud. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). We further conclude, as did the district court, that plaintiffs did not have a contractual right to purchase all of the shares at issue. Accordingly, their purported release of that right pursuant to the settlement agreement they entered into with defendant did not constitute the "sale" of a "security." Finally, we reject plaintiffs' assertion that their actual purchase of half of the additional partnership shares satisfies the "in connection with" requirement of Section 10(b), as enunciated in *Superintendent of Ins. v. Bankers Life and Cas. Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), because there was no causal connection between that purchase and the alleged fraud. Because plaintiffs have failed to state a claim for securities fraud, we affirm the May 2, 2002, judgment of the United States District Court for the Southern District (Charles S. Haight, Jr., *District Judge* ) granting summary judgment in favor of

defendant-appellee Seymour Cohn and dismissing the complaint.

## BACKGROUND

### I. Facts

The facts of this case have been provided in detail in the district court's published opinions, familiarity with which is assumed. *See, e.g., Lawrence v. Cohn,* 197 F.Supp.2d 16 (S.D.N.Y.2002) (*"Lawrence IV"*); *Lawrence v. Cohn,* 932 F.Supp. 564 (S.D.N.Y.1996) (*"Lawrence III"*); *Lawrence v. Cohn,* 816 F.Supp. 191 (S.D.N.Y. 1993) (*"Lawrence II"*); *Lawrence v. Cohn,* 778 F.Supp. 678 (S.D.N.Y.1991) (*"Lawrence I"*). Accordingly, we recite only those facts relevant to this appeal.

The decedent, Sylvan Lawrence ("Sylvan"), and defendant Cohn were brothers who had a longstanding oral partnership through which they engaged in various real estate ventures over the years. In 1968, following several months of negotiations and drafts, they entered into a limited partnership (the "LP") with Jack Aron and several of his family members and business associates (the "Aron Group") for the purpose of purchasing property at 95 Wall Street and constructing a building there for lease or sale. The limited partnership agreement (the "LPA") designated Sylvan and Cohn as the "General Partner"—in the singular—with ownership of 60% of the LP, while the Aron Group, designated the "Limited Partners," owned, in the aggregate, 40% (the "Aron Group Interest").

This case centers on a dispute between Sylvan's successors in interest and Cohn concerning their relative rights with respect to the Aron Group's sale of the Aron Group Interest after Sylvan's death. Paragraph 8 of the LPA is entitled "Assignability of Partnership Interest." Section b of that paragraph provides, in pertinent part:

> In the event that any one or more of the Limited Partners (hereinafter called "Offering Limited Partner") shall receive and wish to accept a *bona fide offer* for the purchase of his interest in the partnership (*hereinafter called the "Outside Offer"*), the Limited Partner shall promptly notify the other Limited Partners thereof giving [them a right of first refusal] to purchase the interest of the Limited Partner on the same terms as the Outside Offer in the proportion [of] their respective interests .... If the Limited Partners [do not exercise their right to purchase then] the Offering Limited Partner shall advise the General Partner of the Outside Offer, giving to the General Partner [a right of first refusal] to purchase the interest of the Offering Limited Partner at the same price and terms as contained in the Outside Offer ....

Joint App. at 151–52 (emphasis added). Paragraph 8(b) goes on to provide that if neither the other limited partners nor the general partner exercises their rights of first refusal, the "Offering Limited Partner" is free to accept the "Outside Offer."

Paragraph 8(c) provides, in pertinent part:

> In the event the General Partner shall receive and wish to accept a *bona fide offer* for the purchase of its interest in the partnership (*hereinafter called the "Outside Offer"*), then the General Partner shall inform the Limited Partners of the Outside Offer and shall offer to sell its interest ... to the Limited Partners or any of them .... The Limited Partners may purchase such interest in the proportion that their respective interests in the partnership bears to the total interests of the Limited Partners ....

Joint App. at 154–55 (emphasis added).

Thus, at the time the LPA was executed, any member of the Aron Group receiving

an "offer" to sell his interest in the LP would first have to offer it proportionately to the other members of the Aron Group. If none of them chose to purchase the interest, then the selling Aron Group member would have to offer it to the General Partner (*i.e.*, Sylvan and Cohn) before selling it to an outside third party. By contrast, the corresponding provision applicable to the General Partner, ¶ 8(c), does not establish a right of first refusal as between Sylvan and Cohn. Rather, the General Partner is, as elsewhere in the LPA, referred to in the singular, and the only right of first refusal that is triggered by an "Outside Offer" to the General Partner is a right of first refusal among the Limited Partners.

Paragraph 9 of the LPA, entitled "Termination of the Partnership," provides, in part, that if one of the Limited Partners dies, the partnership will continue with the Limited Partner's heirs succeeding to his right to distributions and obligations for losses, but that the successor will not become a "Limited Partner." The day before the LPA was to be signed, the attorney representing the Aron Group, who had acted as the primary draftsman of the agreement, sent a final draft to Cohn and Sylvan's attorney, noting that he had "added a provision [to ¶ 9] about continuance of the partnership if one of the general partners dies." This new provision stated that if either Cohn or Sylvan retired, became incompetent, or died,

> [t]he retired General Partner or the legal representative of the deceased or incompetent General Partner shall be and become a Limited Partner and the share of such retired Partner or of such representatives in the profits [and] losses ... shall be 30%. The interest of the remaining General Partner shall thereafter be 30%.

Joint App. at 158–59. This provision contains the only reference to individual interests held by Sylvan and Cohn as distinct from their collective identity as the General Partner.

In 1981, shortly before Sylvan's death from a protracted illness, the brothers reduced their longstanding oral partnership to a written partnership agreement. Although this agreement specified the nature of the partnership as 50–50, and encompassed approximately 85 properties owned by the brothers, it did not encompass the LPA, perhaps because that partnership was one of the rare ventures that included individuals other than Cohn and Sylvan.

Sylvan died in 1981 and Cohn became the executor and trustee of his estate and residuary trust (collectively, the "Estate") in accordance with the terms of Sylvan's will. In addition to bestowing upon Cohn broad discretionary powers in the management and disposition of the Estate, Sylvan's will expressly provided that "[t]he powers granted by this Article shall not be affected or impaired by the fact that my Executor or Trustee may be a part owner of the property involved or a partner or managing partner of one or more partnerships which own the property or business involved."

During Sylvan's illness, Cohn and Jack Aron had begun negotiating the possible sale of the Aron Group Interest. *Lawrence IV*, 197 F.Supp.2d at 31–32. That deal was realized in March of 1983, when Cohn purchased the entire Aron Group interest as nominee for himself, for the Estate, and "for any combination thereof." *Id.* at 18–19, 23. Shortly thereafter, Cohn brought an advice and direction proceeding in Surrogate's Court to determine how the Aron Group Interest should be allocated between the Estate and Cohn. In January 1984, Cohn submitted an affidavit to the Surrogate's Court stating that in his

opinion any further investment by the Estate in the LP would be imprudent because of the speculative and uncertain nature of the real estate venture, referring to the risks inherent in expiring leases, balloon payments on mortgages, inflation, and the uncertainties of the rental market. Plaintiffs, as the beneficiaries of the Estate, obtained an independent appraisal of the partnership, which was largely consistent with Cohn's appraisal.

In May 1984, before the surrogate had issued a decision concerning the appropriate allocation of the Aron Group Interest, Cohn and the plaintiffs entered into a settlement agreement under which Cohn and the Estate each purchased half of the Aron Group Interest (*i.e.,* an additional 20% each). As part of the settlement, the plaintiffs released any claim to a greater percentage of the Aron Group Interest. Plaintiffs also released any claim that might arise out of a diminution in value of the Aron Group Interest and any claim that the investment was otherwise unsound or unwise. In addition, Cohn represented in the agreement that he had not failed to disclose any material information that "would adversely affect the value of one-half of the Aron Interests." The surrogate approved the settlement as being in the best interest of the Estate. *See In re: Estate of Lawrence,* No. 175/82, Decree Approving Settlement Agreement, Slip Op. at 2 (Surr. Ct. N.Y. County May 18 1984).

Four months after the settlement agreement was signed, the LP entered into a profitable 25–year lease with Chemical Bank for the entire building at 95 Wall Street. Plaintiffs assert that some years later they learned that the Chemical Bank lease had been agreed to in principle in April 1984, before the settlement was signed, such that Cohn's failure to disclose the advantageous pending lease constituted a material misrepresentation about the

future prospects of the LP. Plaintiffs initiated litigation in Surrogate's Court to obtain an accounting and a winding up of the affairs of the Estate, including a dissolution of the partnership. *See Lawrence I,* 778 F.Supp. at 681–82; *In re: Estate of Lawrence,* No. 175–82, Memorandum Decision, Slip Op. at 1 (Surr. Ct. N.Y. County Dec. 7, 1990).

In 1990, while the state court litigation was still ongoing, plaintiffs filed this suit in federal court alleging, *inter alia,* claims under Section 10(b) of the Exchange Act and Rule 10b–5 on the theory that but for Cohn's failure to disclose the impending Chemical Bank lease, plaintiffs would not have agreed to the settlement equalizing the distribution of the Aron Group Interest, and would instead have purchased the entire interest. *See Lawrence I,* 778 F.Supp. at 679.

## II. The District Court Proceedings

The district court initially dismissed plaintiffs' Section 10(b) and Rule 10b–5 claims as time-barred under the reasoning of *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). *See Lawrence I,* 778 F.Supp. at 682. After plaintiffs filed an appeal, this court granted plaintiffs' request for a remand in order to allow them to file a motion with the district court pursuant to Fed.R.Civ.P. Rule 60(b). *See Lawrence v. Cohn,* No. 90 Civ. 2396(CSH), 1992 WL 30699, at *1 (S.D.N.Y. Feb.11, 1992); *Lawrence v. Cohn,* No. 90 Civ. 2396(CSH), 1992 WL 18801, at *1–*2 (S.D.N.Y. Jan.28, 1992). In response to that motion, the district court reversed its earlier decision in the wake of Congress's passage of Section 27A of the Exchange Act, which reinstated pre-*Lampf* cases that had been dismissed as time-barred under *Lampf. See Lawrence*

*II*, 816 F.Supp. at 194–95, 197.[1] The district court then denied defendant's motion to dismiss, holding that plaintiffs had standing to bring a securities fraud claim and that plaintiffs' complaint had stated a viable claim upon which relief could be granted. *See Lawrence III*, 932 F.Supp. at 573, 577–78.

Following discovery, Cohn moved for summary judgment and plaintiffs cross-moved for partial summary judgment seeking, *inter alia*, a declaration that they were sellers of a security for purposes of Section 10(b) and Rule 10b–5. Judge Haight, in a typically careful and thoughtful opinion, then granted the defendant's motion following a detailed analysis of whether plaintiffs had a right of first refusal, either under the LPA or at common law, entitling them to purchase the entire Aron Group Interest. *See Lawrence IV*, 197 F.Supp.2d at 21–38. Concluding that they had no such right, the district court held that plaintiffs could not establish securities fraud because they could not establish the element of loss causation. *See id.* at 32, 38. The plaintiffs appealed.

## DISCUSSION

### I. Standard of Review

We review the grant of summary judgment *de novo*. *See Beckford v. Portuondo*, 234 F.3d 128, 130 (2d Cir.2000). Summary judgment is appropriate only where, "[e]xamining the evidence in the light most favorable to the nonmoving party," *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 547 (2d Cir.1998), the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," Fed.R.Civ.P. 56(c).

### II. Section 10(b) and Rule 10b–5

■ In order to state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b–5 promulgated by the SEC thereunder (collectively, " § 10(b)"), a plaintiff must establish that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir.2000); *see also In re Carter–Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 155–56 (2d Cir.1998); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir.1996); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995).

In *Blue Chip Stamps*, the Supreme Court addressed the circumstances under which a plaintiff has standing to bring a private cause of action under § 10(b). *See* 421 U.S. at 730, 95 S.Ct. 1917. Adopting a rule previously announced by the Second Circuit, the Court held that in order to bring an action for damages under § 10(b), the plaintiff must be an actual purchaser or seller of a security. *Id.* at 730–31, 95 S.Ct. 1917. The *Blue Chip Stamps* Court concluded that application of this rule serves to bar three classes of potential plaintiffs from bringing actions under § 10(b), including, most pertinent to this case, the class of

potential purchasers of shares either in a new offering or on the Nation's post-distribution trading markets, who allege that they decided not to purchase be-

---

1. In light of our disposition, we assume without deciding that plaintiffs' securities fraud claim accrued within the applicable statute of limitations period. *See Lawrence II*, 816

F.Supp. at 196–97 (declining to address defendant's argument that plaintiffs' claim was time-barred under pre-*Lampf* statute of limitations).

cause of an unduly gloomy representation or the omission of favorable material which made the issuer appear to be a less favorable investment vehicle than it actually was.

421 U.S. at 737, 95 S.Ct. 1917.

Noting that the definition of "security" found in § 3 of the Exchange Act, 15 U.S.C. § 78c(a)(10),[2] includes any contract to purchase or sell a security (such as a put, option, or call), the Court further held that plaintiffs who have contractual rights or duties to purchase or sell securities could also maintain an action under § 10(b). *See id.* at 750–51, 95 S.Ct. 1917. The Court cautioned, however, that it was including contractual rights "not because of a judicial conclusion that [such plaintiffs] were similarly situated to 'purchasers' or 'sellers,' but because the definitional provisions of the 1934 Act themselves grant them such status." *Id.*

The *Blue Chip Stamps* case involved an antitrust consent decree entered into between the government and Blue Chip Stamps that had conferred upon the class plaintiffs a proportionate right of first refusal to purchase certain shares of Blue Chip stock in a stock offering. *Id.* at 725–26, 95 S.Ct. 1917. The class plaintiffs did not exercise this right in the offering. Later, the class plaintiffs filed a claim under § 10(b) alleging that the defendants had purposely provided them with materially misleading information that was overly pessimistic about the future prospects of the stock, causing them not to purchase it. *See id.* at 726–27, 95 S.Ct. 1917. The Court held that the class plaintiffs lacked standing under § 10(b) because they did not have an enforceable contract right to purchase the stock and, thus, were not purchasers of a security as required by § 10(b). *Id.* at 751, 95 S.Ct. 1917.

In denying Cohn's motion to dismiss on the pleadings, the district court had ruled in 1996 that plaintiffs had standing as purchasers or sellers under § 10(b) on two theories: (1) that the Estate's asserted right of first refusal to purchase the entire Aron Group Interest constituted an option, hence a security, that was "sold" by plaintiffs when they entered into the settlement agreement with Cohn; and (2) that the Estate's purchase of half of the Aron interest was the purchase of a security sufficient to satisfy the requirements of § 10(b). *See Lawrence III*, 932 F.Supp. at 570–71, 577–78. In later granting summary judgment in Cohn's favor, however, the district court held that plaintiffs had failed to establish that they were legally entitled to purchase the entire Aron Group Interest and, thus, had failed to qualify as either a purchaser or seller of a security.

---

**2.** 15 U.S.C. § 78c(a)(10) provides:

The term "security" means any note, stock, treasury stock, security future, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

The primary issue in this case is whether, following discovery and the motions for summary judgment, there exists a genuine factual dispute as to whether the plaintiffs were actual purchasers or sellers of a security. Plaintiffs maintain that they were "sellers" of a "security" because they had a) a contractual right of first refusal to purchase the entire Aron Group Interest; b) a common law right of first refusal arising from Cohn's fiduciary duties to the Estate; and/or c) a common law right to purchase the entire Aron Group Interest under the "Best Interests of the Estate" standard, all of which were forfeited, and thus "sold," pursuant to the settlement agreement. In addition, plaintiffs assert that they also satisfy the rule announced in *Blue Chip Stamps* because they purchased one half of the Aron Group Interest pursuant to the settlement agreement. We address each of these contentions in turn.

III. Contractual Right of First Refusal

Plaintiffs renew their claim that the Estate, as a Limited Partner, had a right of first refusal under the LPA to purchase the entire Aron Group Interest. Although our reasoning differs somewhat from that of the district court, we agree that plaintiffs did not have a contractual right of first refusal with respect to the entire Aron Group Interest.

For purposes of deciding the motion for summary judgment, the district court assumed, without deciding, that the beneficiaries of the Estate had become Limited Partners upon Sylvan's death by virtue of ¶ 9 of the LPA. *See Lawrence IV,* 197 F.Supp.2d at 30–31. The district court then examined whether ¶ 8(b)'s provision creating a proportionate right of first refusal was triggered by Cohn's offer to purchase the Aron Group Interest. *Id.* at 24; *see generally id.* at 25–33. The district court looked to: 1) the conduct of the

parties at the time the LPA was drafted and when Cohn purchased the Aron Group interests; 2) ordinary custom and usage of the terms "bona fide offer" and "outside offer"; 3) case law; and 4) common sense based on the "overall contractual scheme." *Id.* at 25. The district court held that none of the foregoing supported plaintiffs' contention that the LPA granted them a right of first refusal with respect to the entire Aron Group Interest. We agree.

■ As an initial matter, the district court found that ¶ 8(b) was ambiguous because it referred to both "bona fide offer" and "outside offer" without defining the types of offers to which these terms applied. *Id.* at 20–21. This ambiguity permitted the district court to turn to extrinsic evidence to construe the provision. Plaintiffs contend that resort to extrinsic evidence was unnecessary because the term "bona fide offer" is not ambiguous and the term "outside offer" was merely an abbreviation for convenience that carried no substantive meaning. We reject this argument. Paragraph 8(b) used the term "outside offer" substantively, as the definitional term for "bona fide offer." Thus, there is an ambiguity as to whether ¶ 8(b) is triggered by any bona fide offer— read broadly—or only by an offer coming from someone "outside" the LP. In light of this ambiguity, the district court's resort to extrinsic evidence was proper.

To determine the parties' intent in drafting the LPA, the district court considered contemporaneous memoranda written by the Aron Group's attorney, the conduct of the parties at the time of the sale of the Aron Group interests, and the 30–year business relationship between Cohn and Sylvan. Specifically, the district court observed that a memorandum written by Robert Steefel, the attorney representing the Aron Group and the principal draftsman of the LPA, stated that the LPA

would contain a provision such that "[b]efore either group [i.e., the Arons or Sylvan and Cohn] can sell its interest, it must give the other side a right of first refusal. One entity shall represent each of the two interests in this connection. There shall be the normal right of transfer between families." *Id.* at 21.

The district court also noted that at the time the Aron Group Interest was purchased by Cohn on behalf of himself and the Estate, no right of first refusal had been offered to the Estate nor had the issue been raised by either of the able attorneys representing Cohn and the Aron Group. *Id.* at 23–24, 25–26. Both attorneys stated that they had not believed at the time that ¶ 8(b) applied to the transaction. *See id.* The district court found that this "militate[d] in favor of Cohn's" interpretation of the LPA. *Id.* at 26. Plaintiffs argue that the district court's consideration of the parties' conduct at the time of the 1983 sale was improper because it had no bearing on the proper construction of ¶ 8(b), which was drafted in 1968. We agree that this evidence, standing alone, would not have provided sufficient evidence of the parties' intentions in 1968. When viewed together with the other circumstantial evidence, however, it strongly supports the district court's conclusion that the late addition in ¶ 9 of a succession provision for the General Partner was not intended to permit a change in the proportional ownership interests either between the Arons and the General Partner or between Cohn and Sylvan.

 Turning to custom and usage, the district court relied on an affidavit from Lauris Rall, a partner at Thacher Proffit & Wood who had expertise based on his extensive experience in partnerships and subspecialty in limited partnerships. *Id.* at 26. Rall stated that use of the terms "bona fide offer" and "outside offer"

in a partnership agreement, absent express words to the contrary, "invariably" means offers from a non-partner third party because the purpose for such provisions is to exclude outsiders from entering the partnership absent full agreement by the remaining partners. *Id.* He further stated that he had never seen a partnership agreement in which the term "bona fide offer" included offers from pre-existing partners. *Id.* at 27. The district court found that Rall's interpretation was supported by New York case law, which provides that because a right of first refusal constitutes a restraint on transfer, it should be construed narrowly as applying only to offers from outsiders unless the agreement contains express language to the contrary. *See Globe Slicing Mach. Co. v. Hasner*, 333 F.2d 413, 415 (2d Cir.1964) (citing *Storer v. Ripley*, 12 Misc.2d 662, 178 N.Y.S.2d 7 (N.Y.1958); *Lane v. Albertson*, 78 A.D. 607, 79 N.Y.S. 947 (2nd Dept. 1903)); *cf. Allen v. Biltmore Tissue Corp.*, 2 N.Y.2d 534, 541, 161 N.Y.S.2d 418, 141 N.E.2d 812 (1957) (construing similar provisions as requiring a shareholder to provide corporation or fellow shareholders "an opportunity to buy [his shares] before he is free to offer it to outsiders.").

Although plaintiffs have not offered any New York cases that contradict Rall's affidavit or the district court's limiting construction, they argue that it was error for the district court to consider Rall's affidavit because 1) there was no evidence that Cohn, Sylvan, or their attorney (none of whom had much experience with respect to written limited partnership agreements) knew or should have known of any supposed specialized meaning of the term "bona fide offer" or "outside offer"; 2) there is no credible evidence that these terms have a fixed, invariable meaning as required by New York law to constitute custom and trade usage; and 3) there is no

evidence that these terms carried such meaning in 1968, given that Rall has been a practicing attorney only since 1978. We find no error in the district court's reasoning. Rall's affidavit constituted credible evidence of the invariable meaning of the terms, and it was not contradicted by any evidence proffered by the plaintiffs. The possibility that Cohn, Sylvan, and their attorney were not familiar with the common usage meaning of "Outside Offer" carries little weight because the principal draftsman of the LPA was Steefel, the Aron Group's attorney. Finally, while Rall may have begun practicing in 1978, his expertise necessarily is based on agreements and case law pre-dating that time.

█ The district court also employed what it termed "common sense" to construe ¶ 8(b), noting that the purpose of ¶ 8(b) was to prevent the dilution of the Aron Group Interest by outsiders and then to allow the General Partners the opportunity to exclude outsiders in the event none of the Limited Partners did. *Lawrence IV*, 197 F.Supp.2d at 30. Viewing this purpose against the fact that the changes to the succession provisions of ¶ 9 were made the day before the agreement was signed and were added for the express purpose of continuing the partnership in the event of the retirement or death of Sylvan or Cohn, the district court reasoned that it would make no sense to construe ¶ 8(b) as applying to anything other than outside offers. *Id.* at 30, 31. The district court concluded that "common sense and the plain meaning of the adjective 'outside' defeat[ed] plaintiffs' contention." *Id.* at 32.

Plaintiffs challenge the district court's reasoning, arguing that the plain meaning of the words "bona fide offer" and common sense support reading ¶ 8(b) as applying to an offer by partners, particularly General Partners. Plaintiffs put forward several

interpretations of ¶ 8(b), all of which would give the Estate a right of first refusal. Of these, the only plausible one is that ¶ 8(b) should be interpreted as applying to offers by anyone other than limited partners as a class, because otherwise the general partners could dilute the holdings of the limited partners. This argument, however, simply expands upon the district court's finding that the purpose of ¶ 8(b) was to protect the Aron Group Interest from dilution. Plaintiffs offer no satisfactory explanation for why the parties would intend to have the share of a Limited Partner who used to be a General Partner protected from dilution by the other General Partner. Moreover, plaintiffs' reading of ¶ 8(b) as applying to such a limited partner would actually create a mechanism for diluting the Aron Group Interest because if one of the Aron Group members received an outside offer to sell, the Estate, as a new Limited Partner, would get a proportional right of first refusal along with the other Aron Group members.

While we conclude that the district court's finding that "Outside Offer" applied only to offers from non-partners was not erroneous, we also agree with the interpretation proffered by Cohn on appeal, an interpretation the district court found unnecessary to address. *See id.* at 30–31 & n. 7. Cohn maintains that ¶ 8(b) was intended to apply only to the Limited Partners and General Partner as they were originally designated in the LPA, and that no one considered the possible implications of the late changes to the succession provisions of ¶ 9. *Cf. Boswell v. Buhl*, 213 Pa. 450, 63 A. 56, 57 (1906) (contract giving stockholders proportionate right of first refusal demonstrated the "manifest intention of the parties ... that the relative holdings of the *original* owners of the common stock should be maintained" (emphasis added)); *Coleman v. Kettering*, 289

S.W.2d 953, 955–56 (Tex.Civ.App.1956) (same).

In any event, we easily conclude that none of the interpretations proffered by plaintiffs are tenable. Any interpretation of ¶ 8(b) that would give the Estate a right of first refusal would necessarily give the Aron Group a right of first refusal ahead of Cohn to purchase the Estate's share of the LP in the event Cohn (or anyone else) offered to buy the Estate's share of the partnership. Similarly, if Cohn received an outside offer to sell his 30% interest, the Aron Group would have a right of first refusal to purchase its proportionate interest, which, because the Aron Group held a 40% interest and the Estate held only a 30% interest, would shift control over the LP to the Aron Group. And, as noted by the district court, *see Lawrence IV,* 197 F.Supp.2d at 38, the specific result argued by the plaintiffs would permit the Estate to unilaterally increase its share of the partnership to 70% and leave Sylvan's life-long equal partner with only 30%. It is inconceivable to us that such changes in the proportion of ownership interests, and hence control, that would arise under plaintiffs' interpretations of ¶ 8(b) could have been intended when the parties added, at the last minute, a provision that made the successor of either General Partner into a Limited Partner.

## IV. Common Law Rights

We next consider plaintiffs' claims that they were entitled to purchase the entire Aron Group Interest pursuant to various theories under New York's common law.

### A. Right of First Refusal under New York's Law of Fiduciaryship

The district court rejected plaintiffs' claim that they had a right of first refusal under New York's common law by virtue of Cohn's asserted fiduciary duty as execu-

tor and trustee to offer the entire Aron Group Interest to the Estate before purchasing any portion of it for himself. *See Lawrence IV,* 197 F.Supp.2d at 38. Plaintiffs argue that the district court misconstrued Cohn's duty of undivided loyalty. They cite to Judge Benjamin Cardozo's famous pronouncement in *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 547 (N.Y.1928), that "[a] trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." Plaintiffs contend that this eloquent standard is dispositive of their claim.

■ Apart from the difficulty of ascertaining the legal contours of such remarkable prose, we conclude that even if plaintiffs have a common law right to purchase the entire Aron Group Interest, it would not satisfy the standing requirements of § 10(b). Thus, to the extent the district court held that a common law right of first refusal would qualify as a "security" under § 10(b), *see Lawrence IV,* 197 F.Supp.2d at 33, we think it was mistaken.

As we have discussed, *Blue Chip Stamps* strictly limited standing to bring suit under § 10(b) to actual purchasers and sellers of a security and those plaintiffs with a *contractual* right to purchase or sell a security. *See* 421 U.S. at 737, 750–51, 95 S.Ct. 1917. Plaintiffs' asserted common law rights do not meet this requirement.

Plaintiffs, noting that the Supreme Court has declared that § 10(b) must be read "flexibly, not technically and restrictively," *Superintendent of Ins.,* 404 U.S. at 12, 92 S.Ct. 165 (1971), point to cases in which, they assert, the *Blue Chip Stamps* rule was adapted to new circumstances. *See, e.g., Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993) ("Employment contracts promising shares as

compensation are generally considered securities transactions within Rule 10b–5."); *Yoder v. Orthomolecular Nutrition Inst., Inc.,* 751 F.2d 555, 558–61 (2d Cir.1985) (holding that stock offered as an inducement to accept employment qualifies as a purchase or sale of securities under the Securities Exchange Act). But every case cited by plaintiffs involved some sort of actual purchase or sale of a security or a contractual right or duty to purchase or sell a security. *See, e.g., Norris v. Wirtz,* 719 F.2d 256, 258, 261 (7th Cir.1983) (holding that trust beneficiary had standing under § 10(b) because trustee's sale of stock required beneficiary's consent, which was obtained through material misrepresentations); *Mallis v. FDIC,* 568 F.2d 824, 829 (2d Cir.1977) (holding that pledgee of stock in loan contract had § 10(b) standing); *Banco Nacional de Costa Rica v. Bremar Holdings Corp.,* 492 F.Supp. 364, 372 (S.D.N.Y.1980) (holding that guarantor on loan had standing); *see also Rubin v. United States,* 449 U.S. 424, 431, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981) (holding that a pledge constitutes a "sale" or "offer" under the 1933 Securities Act).

Moreover, even if there were circumstances under which a non-contractual legal entitlement to purchase or sell securities could satisfy the rule announced in *Blue Chip Stamps,* the existence and scope of the common law rights asserted by plaintiffs in this case are, as we will explain, so uncertain that they preclude the application of such an exception here. *See Blue Chip Stamps,* 421 U.S. at 751, 95 S.Ct. 1917 (holding that even if there were flexibility in the requirement of an actual purchaser or seller of a security, the plaintiffs, as offerees pursuant to a consent decree, "would be unlikely candidates for such a judicially created exception").

We do not dispute plaintiffs' assertion that Cohn was subject to the strict loyalty demanded of fiduciaries as expressed by Judge Cardozo. *See Meinhard,* 164 N.E. at 547. But as the district court aptly observed, "the application of that principle to a particular case is frequently more complex." *Lawrence IV,* 197 F.Supp.2d at 34. Significantly, not one of the cases plaintiffs cite to support their interpretation of a fiduciary's duties with respect to a business opportunity yielded the result that the affected estate, partner, or trust was entitled to the entire business opportunity at issue. In *Meinhard* itself, the Court of Appeals held that a managing co-venturer who breached his fiduciary duty by appropriating a business opportunity to himself was obligated to transfer half of the interest in the new venture less one share so as to preserve to the breaching partner "the power, control and management which under the plan of the joint venture he was to have from first to last." 249 N.Y. at 469, 164 N.E. 545. Indeed, the goal in each of these cases appears to have been "preserving the balance of control" between the fiduciary and his *cestui que trust. Renz v. Beeman,* 589 F.2d 735, 748 (2d Cir.1978) (remanding to district court to consider a remedy consistent with maintaining the balance of control between the two family branches of the trust beneficiaries); *see also Wootten v. Wootten,* 151 F.2d 147, 150 (10th Cir.1945) (remanding for consideration of whether executor and trustee who purchased entire business opportunity for himself breached fiduciary obligations by "fail[ing] to purchase *half of such stock* for the estate and ... trusts" (emphasis added)).

Based on our review of these cases, there is little reason to believe that a New York court would effect "a division [of the Aron Group Interest that] would fundamentally skew the equal division of interests which the two Founding Brothers, Sylvan Lawrence and Seymour Cohn, al-

ways maintained." *Lawrence IV,* 197 F.Supp.2d at 38. Accordingly, plaintiffs' alleged common law right of first refusal is simply too conjectural to satisfy even a broad reading of *Blue Chip Stamps.*

### B. Best Interests of the Estate

■ Plaintiffs argue that even if the Estate did not have a right of first refusal, the Surrogate Court applying the "Best Interest of the Estate" standard, would have ordered that the Estate be allowed to purchase the entire Aron Group Interest and, thus, that plaintiffs suffered concrete damages by settling the advice and direction proceeding in reliance on Cohn's omissions regarding the impending Chemical Bank lease. The district court did not address this issue, refusing to speculate on how the surrogate would have decided the case. *See Lawrence IV,* 197 F.Supp.2d at 38. We need not address this issue either, but for a different reason. Even if plaintiffs are correct that the surrogate would have allowed the Estate to purchase the entire Aron Group interest, the discretionary nature of the surrogate's decision would not constitute a *contractual* right to purchase or sell a security or create any type of legal entitlement enforceable in a court of law. Accordingly, it fails to satisfy the requirements of § 10(b) under any conceivable reading of *Blue Chip Stamps.*

### V. The Estate's Purchase of Half of the Aron Group Interest

■ Finally, plaintiffs argue that their purchase of half of the Aron Group Interest satisfies the requirement that they be an actual purchaser or seller of a security. This argument fails because plaintiffs cannot establish any causal connection between that purchase and the fraudulent harm they claim to have suffered.

The Supreme Court has interpreted the "in connection with" language of § 10(b) to require that the plaintiff have "suffered an injury as a result of deceptive practices touching [the purchase or] sale of securities." *Superintendent of Ins.,* 404 U.S. at 12–13, 92 S.Ct. 165. Put another way, "[h]owever deceitful and false the misrepresentations may have been, the plaintiff must be a purchaser or a seller ... in a purchase or sale as to which there is a claim of fraud." *Morrow v. Schapiro,* 334 F.Supp. 399, 402–03 (E.D.Mo.1971).

Plaintiffs' claim here is not that they purchased half of the Aron Group Interest in reliance on alleged misrepresentations about the future prospects of the LP, but rather that they were fraudulently induced to forgo purchasing the other half. Cohn's alleged misrepresentations, then, did not affect or "touch" the actual purchase made by plaintiffs. This case is similar to *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 193–94 (3rd Cir.1976), in which the court rejected plaintiffs' standing to bring a § 10(b) claim on the ground that there was no causal connection between plaintiffs' purchase of some shares and defendant's alleged fraud in refusing to sell the remaining shares in accordance with the parties' agreement. *See also Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1443 n. 7 (5th Cir.1993) (holding that class plaintiffs "who purchased securities prior to the distribution of the [allegedly fraudulent] prospectus could not possibly have been induced to invest ... by that prospectus," and thus did not have standing to sue under § 10(b)); *Hunt v. Robinson,* 852 F.2d 786, 787 (4th Cir.1988) (holding that "the 'causal connection between the alleged fraud and the purchase or sale of stock' required to state a federal cause of action under § 10(b) is lacking" where fraudulent harm arises not from purchase of shares but from defendant's refusal to transfer promised shares); *Liberty Nat'l Ins. Holding Co. v. Charter Co.,* 734 F.2d

545, 555 (11th Cir.1984) (observing that the "in connection with" element requires a causal relationship between the claimed deception and a subsequent purchase or sale); *cf. Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir.1977) (fraudulent inducement to retain securities is not a Rule 10b–5 violation because it is not directly "in connection with" any purchase or sale).

Because plaintiffs have alleged no fraud "in connection with" their purchase of half of the Aron Group Interest, that purchase cannot be used to satisfy the standing requirements of *Blue Chip Stamps*.

## VI. Additional Arguments

Plaintiffs' remaining arguments are permutations of those we have addressed. They lack merit for the reasons we have discussed.

### CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.